1
2
3
4
5
6
7
8

UNITED STATES DISTRICT COURT

9

FOR THE EASTERN DISTRICT OF CALIFORNIA

10

| | |
|---|---|
| 11 GUADALUPE RUIZ, | No. 1:21-cv-00759-DAD-SKO (HC) |
| 12 Petitioner, | **FINDINGS AND RECOMMENDATION** |
| 13 v. | **TO DENY PETITION FOR WRIT OF HABEAS CORPUS** |
| 14 T. CISNEROS, Warden, | **[THIRTY DAY OBJECTION DEADLINE]** |
| 15 Respondent. | |

16

17    Petitioner is a state prisoner proceeding *pro se* and *in forma pauperis* with a petition for

18 writ of habeas corpus pursuant to 28 U.S.C. § 2254. He is currently in state prison serving a

19 sentence of 18 years-to-life for second degree murder. The habeas petition presents three claims

20 challenging the conviction. As discussed below, the Court finds the claims to be without merit

21 and recommends the petition be **DENIED.**

22 **I.     PROCEDURAL HISTORY**

23    On September 13, 2017, a Kern County jury found Petitioner guilty of second-degree

24 murder (Cal. Penal Code § 187(a)). (Doc. 17-2 at 30.[1]) In a separate court trial, the court found

25 true four of Petitioner's six alleged prior prison terms. (Doc. 17-2 at 12.) On October 12, 2017,

26 the court sentenced him to a term of 15 years to life on the murder conviction, plus a consecutive

27 three-year term on the enhancements. (Doc. 17-2 at 30.)

28 _____

[1] Unless otherwise noted, references are to ECF pagination.

Petitioner appealed to the California Court of Appeal, Fifth Appellate District ("Fifth DCA").  On September 10, 2020, the Fifth DCA affirmed the judgment; however, the three one-year prison prior enhancements were stricken in light of California Senate Bill No. 136.  People v. Ruiz, 2020 WL 5423201, at *10 (Cal. Ct. App. Sept. 10, 2020).  Petitioner filed a petition for review in the California Supreme Court.  On November 24, 2020, the California Supreme Court summarily denied the petition.  (Doc. 17-18.)

On May 12, 2021, Petitioner filed a petition for writ of habeas corpus in this Court. (Doc. 1.) Respondent filed an answer on July 28, 2021. (Doc. 16.)  On September 20, 2021, Petitioner filed a traverse to Respondent's answer. (Doc. 20.)

## II.     FACTUAL BACKGROUND

The facts are derived from the appellate court's Statement of Facts in an unpublished decision[2]:

### A.     The homicide

On November 9, 2015, between 4:00 p.m. and 4:30 p.m., 55-year-old Abel Prendiz and his girlfriend, M., arrived home at their apartment complex after running errands. While Prendiz and M. sat in their truck, two men in a black truck drove up and parked in the parking stall next to them. The men, Petitioner and James, went into the apartment next to Prendiz and M.'s, which belonged to a woman named A.  Petitioner and James had been drinking and decided to visit A.  A. had known James his whole life and had known Petitioner for approximately five years. She referred to James as her "cousin."

Within five minutes, James came out of A.'s apartment, angry, cussing, and swinging his hands.  A. described James as "frantic."  Prendiz and M. were unloading things from their truck when James looked in the direction of Prendiz and M. and said, "What the fuck are you looking at?" Petitioner was still inside of A.'s apartment at this time.  James ran towards Prendiz and started hitting him. James's first strike was to Prendiz's face.

_____

[2] The Fifth DCA's summary of facts in its unpublished opinion is presumed correct.  28 U.S.C. §§ 2254(d)(2), (e)(1). Therefore, the Court will rely on the Fifth DCA's summary of the facts.  Moses v. Payne, 555 F.3d 742, 746 (9th Cir. 2009).

2

1   Prendiz fell to the ground, and James got on top of him and continued hitting him.

2          As Prendiz was on the ground getting hit by James, Petitioner approached M. and

3   stood "nose to nose" with her.  He then went over to Prendiz and James and began hitting

4   Prendiz.  M. testified Petitioner kicked Prendiz in the head "very many times."  When asked

5   what part of Prendiz's head Petitioner had kicked, M. responded, "On the top, on the side,

6   on his ear, in his face, everywhere."  M. yelled at the men to stop and that they were hurting

7   him.  However, as M. testified, "They wouldn't stop. They just kept going, kept on and on.

8   They had no mercy. No mercy."  A. was also present and was yelling at James and Petitioner

9   to stop.  A. and M. tried to pull James off of Prendiz, but he "swung" at them and caused

10  them to go "flying."  A. testified she tried to get Petitioner to assist her in pulling James off

11  of Prendiz, but Petitioner did not help.  M. continued to yell at the men to stop and said,

12  "You are going to kill him."  M. testified blood was "gushing" from Prendiz's head.  A.

13  testified "there was a lot of blood."  According to M., the beating continued until M. yelled,

14  "Look at all the blood."  According to A., the beating stopped when A. told them "the cops

15  are coming right now."  Petitioner and James then stopped and fled.

16         M. testified Prendiz's head "was bleeding all around," his mouth was "busted up

17  inside and out," his ear and head were "stretched out," and his eyes were blackened. She

18  said his head "was like a cone head, but to the side."

19         James testified as part of his plea agreement. He initially testified he was standing

20  in the doorway of A.'s apartment when he heard Petitioner and Prendiz "exchanging words."

21  However, he later testified Petitioner was in the apartment when the fight started.  James

22  approached Prendiz, started "talking trash," accused Prendiz of stealing something, and then

23  began fighting.  Prendiz did not provoke the fight, and James did not know why he was

24  "talking trash" and accusing Prendiz of stealing something.  James had never met Prendiz

25  before.  After the first few blows, Prendiz went into his apartment but then came back

26  outside.  James immediately resumed his attack on Prendiz.  Prendiz fell to the ground and

27  James got on top of Prendiz and continued to punch him.  James said he punched Prendiz

28  in the face "quite a bit."  Two women were yelling at him to stop and that he was going to

3

kill Prendiz, at which point he stopped hitting Prendiz.  After James stopped, Petitioner "just went up to [Prendiz] and kicked him one time" in the "head or face" with his steel-toed boot.  James stated Petitioner "kicked the shit out of [Prendiz]," and said the kick took the attack "to another level."  James and Petitioner then left.  They returned to A.'s apartment later in the day looking for something, but A. told James that the victim had been taken to the hospital, the police were coming, and they had to leave.  James went home and Petitioner went to his own house.

Detectives obtained surveillance video from a nearby trailer that captured portions of the incident.  Excerpts of the footage were shown to the jury.  The footage showed the beginning of James's attack on Prendiz, but did not capture approximately 60 seconds of the fight that occurred outside of the camera's view.  The footage did not capture Petitioner kicking Prendiz.  The footage did, however, show Petitioner trying to break up the fight between James and Prendiz.

A. testified at trial she did not recall Petitioner participating in the attack or kicking Prendiz.  This was contradicted by the 9-1-1 call she made at 4:22 p.m. on the date of the attack.  Although the 9-1-1 call was played for the jury while she was on the witness stand, she stated she did not recall placing the call.  She testified she did not want to be a witness.  She explained her reluctance was due to her being from the "old school," and that she was afraid of being a "snitch at a murder trial" and feared retaliation.  A. also said during an interview with a detective that "they" kicked Prendiz "once or twice."  However, when presented with this prior statement at trial, A. said she did not recall seeing a kick and did not know why she had given the detective that statement.

During her 9-1-1 call, A. requested an ambulance be sent out to her address.  She told the operator her neighbor "need[ed] an ambulance because they, they, they beat him up."  She stated Prendiz was awake and breathing, but had "blood all over his face" and was "losing a lot of blood right now ...."  The operator asked if there was "any serious bleeding," and A. responded "yeah on his face he's got a big contusion" and said it was bloody by his left temple.  The operator instructed her on how to apply a towel to stop the bleeding.

4

When an ambulance crew arrived at the scene, Prendiz was able to speak with them. He was alert and oriented, and stated he was "punched and kicked" by two men. Prendiz nodded his head when a paramedic asked if he was okay. According to the paramedic, Prendiz's head injuries included a large contusion, a laceration, redness, substantial swelling on the left side of his face, swelling at his cheekbone under his left eye, and a large hematoma extending from the left temple down to the top of his upper lip. The paramedic described his injuries as a "major injury." Prendiz was able to walk two or three feet to get onto the gurney.

Prendiz arrived at the hospital and appeared to be in pain and "hurt pretty bad." He had multiple brain injuries, including subarachnoid and subdural bleeds. The brain injuries were on both his right and left sides. He also had multiple facial fractures: in his jaw, cheekbone, maxillary area, and left orbital socket. His eye was swollen and bruised. His attending physician testified Prendiz was speaking coherently when he arrived at the hospital on November 9, and the next day he seemed to be doing "okay" and progressing well. The physician testified the majority of brain bleeds are survivable, but "[a]ll brain bleeds are serious" due to the risk of brain damage and brain death. On November 11, the brain bleeding seemed well-contained, and doctors decided Prendiz could go home and finish recovering with bed rest. According to doctors, when Prendiz was discharged on November 11, he seemed neurologically stable and had only a minor headache.

Prendiz's daughter drove him home, with M. also riding in the car. Prendiz repeated himself multiple times during the ride and seemed very tired. That night, he complained of being in pain, could not chew food, and said, "I don't think I'm going to make it." The next morning, he told M. he was still in pain and said, "I'm not going to make it." M. went to the pharmacy and picked up his prescription medications. When she returned home, she found Prendiz unconscious on the bathroom floor. She called 911, and Prendiz was taken back to the hospital.

Prendiz was "severely impaired" when he arrived back at the hospital. A CT scan revealed massive swelling and a subdural bleed that was "very large" and "causing

5

compression of the brain." The bleeding was in the "same approximate location" as the initial bleed. Emergency brain surgery was done to alleviate the swelling. After the surgery, Prendiz remained in a coma until his family eventually decided that he be provided "comfort care." He died on November 27. One of his attending physicians testified his injuries were consistent with a "traumatic assault" and opined the assault caused his death. Before Prendiz died, surgeons told one of Prendiz's daughters that Prendiz would need separate facial reconstruction surgery.

An autopsy was performed on December 3. The forensic pathologist testified Prendiz's death was caused by "blunt head injuries." The injuries were consistent with a kick from a steel-toed boot, and a single kick from such a boot could have been sufficient to cause the death. However, the nature of the brain bleeding indicated there were probably multiple blows. The pathologist additionally observed bleeding over the "top back skull" underneath the tissues tightly covering the skull, which indicated a "deeper, more extensive type of injury." The fractured facial bones were a sign of "fairly severe force." The fractures would more likely come from kicks than fists. The pathologist also noted an unusual lack of abrasions on Prendiz, as one would expect to see on someone's face who had been kicked with steel-toed boots, although it was possible the tip of a smooth rubber boot could tear the skin without abrading it.

The pathologist also testified Prendiz was a "very sick man with many chronic diseases." Prendiz's liver was also "shot," which made him an "easy bleeder." The pathologist opined a healthy person would "probably not" have died from the injuries Prendiz sustained. He stated Prendiz's damaged liver would explain why the bleeding would have gotten worse after he was released from the hospital.

Petitioner and James were arrested in early January 2016. During Petitioner's interview with detectives, he denied helping James in the fight and kicking or punching Prendiz. He said that he tried to break up the fight, had been fighting his whole life and had never kicked anybody before during a fight. He said, "I usually just use my fists." He stated he had been kicked before and knows how it feels. He acknowledged kicking

6

someone can cause "serious injury," which is why he said he never kicks anybody during fights. He also acknowledged steel-toed boots can be considered a "weapon" and fists "can do some damage." He further agreed with one of the detectives that James was "whippin' [Prendiz's] ass" at the end of the fight and that Prendiz was on the ground. Petitioner said Prendiz "was getting wailed on" and "took so many fuckin' hits."

### B.    Evidence of prior bad act

Earlier on November 9, Petitioner and James were at the house where James was staying, drinking alcohol. Petitioner and James had been friends for 10 years. Another man, D., was also at the house repairing windows and a fence. For no reason, Petitioner shot several BBs from a BB gun at D. and D.'s truck. Several of the BBs struck D and his truck.

D. became upset and approached Petitioner and said, "What the fuck?" Petitioner apologized and gave D. 100 dollars. D. responded, "What? It's not even about that." As D. was loading his tools into his truck, Petitioner punched D. in the face and began "swinging" at D. D. got back to his feet and ran around a car to gather himself. D. attempted to throw a punch at Petitioner, but Petitioner caught D. with a punch that knocked D. to the ground. Petitioner began kicking D. in the ribs several times while wearing steel-toed boots. As D. lie on the ground, looking up, Petitioner lifted his boot and prepared to stomp on D. D. could see the bottom of Petitioner's boot coming at his head. But before Petitioner could bring his boot all the way down, James tackled Petitioner. James told D. to leave and said he would talk to D. later. D. got into his truck and drove away. D. suffered a black eye and "beat up" ribs. Ruiz, 2020 WL 5423201, at *1-4.

## III.    DISCUSSION

### A.    Jurisdiction

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution, laws, or treaties of the United States. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375 n. 7 (2000). Petitioner asserts that he suffered violations of his rights as

1   guaranteed by the United States Constitution.  The challenged conviction arises out of the Kern

2   County Superior Court, which is located within the jurisdiction of this court.  28 U.S.C. §

3   2254(a); 28 U.S.C.§ 2241(d).

4        On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of

5   1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its

6   enactment.  Lindh v. Murphy, 521 U.S. 320 (1997) (holding the AEDPA only applicable to cases

7   filed after statute's enactment).  The instant petition was filed after the enactment of the AEDPA

8   and is therefore governed by its provisions.

9        B.      Legal Standard of Review

10       A petition for writ of habeas corpus under 28 U.S.C. § 2254(d) will not be granted unless

11  the petitioner can show that the state court's adjudication of his claim: (1) resulted in a decision

12  that was contrary to, or involved an unreasonable application of, clearly established Federal law,

13  as determined by the Supreme Court of the United States; or (2) resulted in a decision that "was

14  based on an unreasonable determination of the facts in light of the evidence presented in the State

15  court proceeding."  28 U.S.C. § 2254(d); Lockyer v. Andrade, 538 U.S. 63, 70-71 (2003);

16  Williams, 529 U.S. at 412-413.

17       A state court decision is "contrary to" clearly established federal law "if it applies a rule

18  that contradicts the governing law set forth in [the Supreme Court's] cases, or "if it confronts a set

19  of facts that is materially indistinguishable from a [Supreme Court] decision but reaches a

20  different result."  Brown v. Payton, 544 U.S. 133, 141 (2005) (citing Williams, 529 U.S. at 405-

21  406).

22       In Harrington v. Richter, 562 U.S. 86, 101 (2011), the U.S. Supreme Court explained that

23  an "unreasonable application" of federal law is an objective test that turns on "whether it is

24  possible that fairminded jurists could disagree" that the state court decision meets the standards

25  set forth in the AEDPA.  The Supreme Court has "said time and again that 'an unreasonable

26  application of federal law is different from an incorrect application of federal law.'"  Cullen v.

27  Pinholster, 563 U.S. 170, 203 (2011).  The petitioner "must show far more than that the state

28  court's decision was 'merely wrong' or 'even clear error.'"  Shinn v. Kayer, ___ U.S. ___, ___ ,

8

141 S.Ct. 517, 523, 2020 WL 7327827, *3 (2020) (quoting Virginia v. LeBlanc, 582 U. S. ___,

___, 137 S.Ct. 1726, 1728 (2017) (*per curiam*)).  Rather, a state prisoner seeking a writ of habeas

corpus from a federal court "must show that the state court's ruling on the claim being presented

in federal court was so lacking in justification that there was an error well understood and

comprehended in existing law *beyond any possibility of fairminded disagreement*."  Richter, 562

U.S. at 103 (emphasis added); see also Kayer, 141 S.Ct. at 523, 2020 WL 7327827, *3.  Congress

"meant" this standard to be "difficult to meet."  Richter, 562 U.S. at 102.

     The second prong pertains to state court decisions based on factual findings.  Davis v.

Woodford, 384 F.3d 628, 637 (9th Cir. 2003) (citing Miller-El v. Cockrell, 537 U.S. 322 (2003)).

Under § 2254(d)(2), a federal court may grant habeas relief if a state court's adjudication of the

petitioner's claims "resulted in a decision that was based on an unreasonable determination of the

facts in light of the evidence presented in the State court proceeding."  Wiggins v. Smith, 539

U.S. 510, 520 (2003); Jeffries v. Wood, 114 F.3d 1484, 1500 (9th Cir. 1997).  A state court's

factual finding is unreasonable when it is "so clearly incorrect that it would not be debatable

among reasonable jurists."  Jeffries, 114 F.3d at 1500; see Taylor v. Maddox, 366 F.3d 992, 999-

1001 (9th Cir. 2004), *cert.denied*, Maddox v. Taylor, 543 U.S. 1038 (2004).

     To determine whether habeas relief is available under § 2254(d), the federal court looks to

the last reasoned state court decision as the basis of the state court's decision.  See Ylst v.

Nunnemaker, 501 U.S. 979, 803 (1991); Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir.

2004).  "[A]lthough we independently review the record, we still defer to the state court's

ultimate decisions."  Pirtle v. Morgan, 313 F.3d 1160, 1167 (9th Cir. 2002).

     The prejudicial impact of any constitutional error is assessed by asking whether the error

had "a substantial and injurious effect or influence in determining the jury's verdict." Brecht v.

Abrahamson, 507 U.S. 619, 623 (1993); see also Fry v. Pliler, 551 U.S. 112, 119-120 (2007)

(holding that the Brecht standard applies whether or not the state court recognized the error and

reviewed it for harmlessness).

     C.     Review of Petition

     Petitioner raises three claims in his petition: 1) Insufficient evidence supported the second

9

1   degree murder conviction; 2) Trial court erred by failing to instruct the jury on the lesser offense

2   of involuntary manslaughter, and in the alternative, defense counsel erred by failing to request

3   said instruction; and 3) Trial court erred by admitting evidence of a prior bad act.

4        1.     Insufficiency of the Evidence

5        Petitioner first alleges there was insufficient evidence to support the verdict for second

6   degree murder.  He claims he did not start the fight but tried to break it up.  He alleges the

7   evidence did not support a finding that he acted with implied malice.  Petitioner presented this

8   claim on direct appeal.  In the last reasoned decision, the Fifth DCA denied the claim as follows:

9        Ruiz was convicted of the second degree murder of Prendiz based on the
10   prosecution's theory of implied malice. Murder is the unlawful killing of a human
    being or a fetus with malice aforethought. (Pen. Code, [Fn.2] § 187, subd. (a).) For
    second degree murder, the malice can be implied. (§§ 187, subd. (a); 188.) There is
11   both a physical and mental component to implied malice. (*People v. Guillen*
    (2014) 227 Cal.App.4th 934, 984.) "'"The physical component is satisfied by the
12   performance of 'an act, the natural and probable consequences of which are
    dangerous to life.' [Citation.] The mental component is the requirement that the
13   defendant 'knows that this conduct endangers the life of another and ... acts with a
    conscious disregard for life.'"'" (*People v. Bryant* (2013) 56 Cal.4th 959, 965
14   (*Bryant*).) In short, implied malice requires a defendant's awareness of engaging in
    conduct that endangers the life of another. (*People v. Cravens* (2012) 53 Cal.4th
15   500, 507 (*Cravens*).)

16        [Fn.2] Undesignated statutory references are to the Penal Code.

17   Ruiz contends there was insufficient evidence to support the mental component of
    implied malice. "Our task is clear. 'On appeal we review the whole record in the
18   light most favorable to the judgment to determine whether it discloses substantial
    evidence—that is, evidence that is reasonable, credible, and of solid value—from
19   which a reasonable trier of fact could find the defendant guilty beyond a
    reasonable doubt. [Citation.]' ... The conviction shall stand 'unless it appears "that
20   upon no hypothesis whatever is there sufficient substantial evidence to support [the
    conviction]."'" (*Cravens, supra*, 53 Cal.4th at pp. 507-508.) "All conflicts in the
21   evidence are resolved in favor of the judgment ...." (*People v. Neely* (2009) 176
    Cal.App.4th 787, 793.) We "must ... presume in support of the judgment the
22   existence of every fact the trier could reasonably deduce from the evidence.
    [Citation.] [¶] Although we must ensure the evidence is reasonable, credible, and
23   of solid value, nonetheless it is the exclusive province of the trial judge or jury to
    determine the credibility of a witness and the truth or falsity of the facts on which
24   that determination depends." (*People v. Jones* (1990) 51 Cal.3d 294, 314.)
    Following these well-established standards of appellate review, we conclude there
25   was ample evidence Ruiz was well aware that kicking Prendiz in the head
    endangered his life.
26
    The mental component of implied malice can be satisfied "if [Ruiz] knew that his
27   conduct endangered [Prendiz's] life and he acted with a conscious disregard for
    life." (*People v. Palomar* (2020) 44 Cal.App.5th 969, 977.) "'This component is
28   ordinarily proven by illustrating the circumstances leading to the ultimate deadly

result.'" (*Ibid.*) "'Of course, the jury was entitled to infer [Ruiz's] subjective awareness that his conduct endangered [Prendiz's] life from the circumstances of the attack alone, the natural consequences of which were dangerous to human life. [Citation.] But [Ruiz's] behavior before and after [his kick] further demonstrated that this was not ... a simple fistfight .... These facts, too, bolstered the finding of implied malice.'" (*Id*. at p. 978.)

Prendiz was a vulnerable victim at the time Ruiz kicked him in the head (at least once) with steel-toed boots. Prendiz had already been hit multiple times in the head by James, he was bleeding, and M. and A. were yelling at James and unsuccessfully trying to get James to stop his onslaught. Ruiz was aware of these circumstances, and decided to kick the already beaten 55-year-old Prendiz in the head with steel-toed boots anyway. By the time Ruiz and James finished their attack, Prendiz's head was bloody and deformed, like a "conehead." Ruiz's conduct after the fight also evidences implied malice. Ruiz and James only stopped the assault after A. yelled "you are killing him." At that point, rather than render aid, call 911, or otherwise express any remorse, the two attackers fled. Additionally, during his post-arrest interview with detectives, Ruiz stated he considered steel-toed boots to be a "weapon" capable of causing "serious damage," which he explained is the reason he "does not kick people in fights."

The evidence presented at trial portrayed a brutal, merciless, unnecessary, and unfair (i.e., two men against one) beating of an innocent and vulnerable victim. The evidence further demonstrated Ruiz knew his boots were weapons and knew kicking the vulnerable and already beaten Prendiz in the head would endanger his life. There was thus sufficient evidence of implied malice to support the second degree murder conviction.

Ruiz, 2020 WL 5423201, at *4-5.

            a.      Legal Standard

The law on sufficiency of the evidence is clearly established.  Pursuant to the United States Supreme Court's holding in Jackson v. Virginia, 443 U.S. 307, the test on habeas review to determine whether a factual finding is fairly supported by the record is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  Jackson, 443 U.S. at 319; see also Lewis v. Jeffers, 497 U.S. 764, 781 (1990).  Thus, only if "no rational trier of fact" could have found proof of guilt beyond a reasonable doubt will a petitioner be entitled to habeas relief. Jackson, 443 U.S. at 324.  Sufficiency claims are judged by the elements defined by state law.  Id. at 324, n. 16.

If confronted by a record that supports conflicting inferences, a federal habeas court "must presume–even if it does not affirmatively appear in the record–that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution."  Id. at 326.

1   Circumstantial evidence and inferences drawn from that evidence may be sufficient to sustain a

2   conviction.  Walters v. Maass, 45 F.3d 1355, 1358 (9th Cir. 1995).

3          After the enactment of the AEDPA, a federal habeas court must apply the standards of

4   Jackson with an additional layer of deference.  Juan H. v. Allen, 408 F.3d 1262, 1274 (9th Cir.

5   2005).  In applying the AEDPA's deferential standard of review, this Court must presume the

6   correctness of the state court's factual findings.  28 U.S.C. § 2254(e)(1); Kuhlmann v. Wilson,

7   477 U.S. 436, 459 (1986).

8          In Cavazos v. Smith, 565 U.S. 1 (2011), the United States Supreme Court further

9   explained the highly deferential standard of review in habeas proceedings, by noting that Jackson

10         makes clear that it is the responsibility of the jury - not the court - to decide what
           conclusions should be drawn from evidence admitted at trial. A reviewing court may
11         set aside the jury's verdict on the ground of insufficient evidence only if no rational
           trier of fact could have agreed with the jury. What is more, a federal court may not
12         overturn a state court decision rejecting a sufficiency of the evidence challenge
           simply because the federal court disagrees with the state court. The federal court
13         instead may do so only if the state court decision was "objectively unreasonable."

14         Because rational people can sometimes disagree, the inevitable consequence of this
           settled law is that judges will sometimes encounter convictions that they believe to
15         be mistaken, but that they must nonetheless uphold.

16  Id. at 2.

17                 b.      Analysis

18         A federal habeas court determines sufficiency of the evidence in reference to the

19  substantive elements of the criminal offense as defined by state law.  See Jackson, 443 U.S. at

20  324 n. 16.  Petitioner claims there was insufficient evidence to support the mental component of

21  implied malice.  As stated by the appellate court above, the mental component is satisfied "if

22  [Petitioner] knew that his conduct endangered [the victim's] life and he acted with a conscious

23  disregard for life."  Id. at 2 (quoting People v. Palomar, 44 Cal.App.5th 969, 977 (2020)).

24         The Fifth DCA noted that there was substantial evidence from which a jury could

25  determine that Petitioner was well aware that his conduct endangered the victim and acted with

26  conscious disregard for the victim's life.  The court noted that Petitioner had kicked the victim in

27  the head at least once with steel-toed boots, and Petitioner had stated that he considered steel-toed

28  boots to be a weapon capable of causing serious damage.  Moreover, Petitioner inflicted these

                                          12

1  fatal injuries on the victim after he was beaten and lying defenseless on the ground.  The injuries

2  were so brutal that the victim's head had become bloody and deformed, and shaped like a

3  "conehead."  Id.  Petitioner only ceased the attack after a witness yelled, "You are killing him."

4  Id.  Thereafter, despite the victim's condition, Petitioner and the other attacker did not render or

5  call for aid, but fled the scene showing no remorse.

6        Viewing the evidence in the light most favorable to the prosecution, Petitioner fails to

7  show that no rational trier of fact would have agreed with the state court's determination.

8  Petitioner fails to demonstrate that the state court rejection of his claim was contrary to, or an

9  unreasonable application of, the Jackson standard.  The claim should be denied.

10        2.        Instructional Error

11        Petitioner next contends the trial court erred in failing to instruct the jury on involuntary

12  manslaughter.  He alleges the killing was committed without malice and constituted involuntary

13  manslaughter.  In the alternative, he claims counsel was ineffective in failing to request the

14  instruction.  Petitioner also raised this claim on direct review in the state courts.  The Fifth DCA

15  denied the claim as follows:

16        Ruiz next contends the trial court prejudicially erred by not instructing the jury on
          the lesser included offense of involuntary manslaughter. The trial court instructed
17        the jury on second degree murder and the lesser included offense of voluntary
          manslaughter. Ruiz's trial counsel requested an instruction on involuntary
18        manslaughter due to voluntary intoxication, but admitted he did not see a basis for
          such instruction. Ruiz did not otherwise request an involuntary manslaughter
19        instruction. The People objected to an involuntary manslaughter instruction
          because of a lack of evidence supporting the absence of malice. The court declined
20        to give an involuntary manslaughter instruction because it did not "find any facts
          to support the warranting of giving involuntary manslaughter in this case." Ruiz
21        argues the trial court had a sua sponte duty to instruct on involuntary
          manslaughter. Alternatively, he argues that if the court did not have a sua sponte
22        duty to so instruct, his trial counsel was ineffective for failing to request an
          involuntary manslaughter instruction.
23
          We conclude the evidence presented at trial did not create a reasonable doubt that
24        the fatal assault on Prendiz was second degree murder on an implied malice
          theory. As such, the trial court would have had no duty to instruct on involuntary
25        manslaughter, even had a request been made.

26
                A. Law and Analysis
27
          "'The trial court is obligated to instruct the jury on all general principles of law
28        relevant to the issues raised by the evidence, whether or not the defendant makes a

                                              13

formal request.' ... 'That obligation encompasses instructions on lesser included offenses if there is evidence that, if accepted by the trier of fact, would absolve the defendant of guilt of the greater offense but not of the lesser.' ... 'To justify a lesser included offense instruction, the evidence supporting the instruction must be substantial—that is, it must be evidence from which a jury composed of reasonable persons could conclude ... "that the lesser offense, but not the greater, was committed." ... "On appeal, we review independently the question whether the trial court failed to instruct on a lesser included offense."'" (*People v. Souza* (2012) 54 Cal.4th 90, 115–116, citations omitted.)

The theory of involuntary manslaughter Ruiz contends was warranted by the evidence here is described in *People v. Brothers* (2015) 236 Cal.App.4th 24 (*Brothers*). Under that theory, a defendant is guilty of involuntary manslaughter when he or she commits a killing, without malice, during an inherently dangerous assaultive felony. (*Id*. at pp. 33–35.)

To explain how the *Brothers* court reached its conclusion that a killing, without malice, during an inherently dangerous assaultive felony is involuntary manslaughter, some background discussion would be helpful. Manslaughter is defined as "the unlawful killing of a human being without malice." (§ 192.) Further, involuntary manslaughter is defined as an unlawful killing "in the commission of an unlawful act, not amounting to a felony; or in the commission of a lawful act which might produce death, in an unlawful manner, or without due caution and circumspection." (§ 192, subd. (b).) In *Bryant, supra*, 56 Cal.4th at p. 970, our Supreme Court explained that although the Penal Code does not specify the type of manslaughter committed when a defendant kills without malice during an inherently dangerous assaultive felony, such a killing is not voluntary manslaughter. Because review was not granted on the issue, *Bryant* expressly declined to address whether a killing without malice during an inherently dangerous felony could support a conviction for involuntary manslaughter. (*Id*. at pp. 970–971.) However, Justice Kennard's concurrence analyzed the issue and concluded a defendant who kills unlawfully during an assault with a deadly weapon, but without malice, may be found guilty of involuntary manslaughter. (*Id*. at pp. 971–974, conc. opn. of Kennard, J.)

*Brothers* directly considered the issue not reached by *Bryant* but addressed in Justice Kennard's concurrence. The *Brothers* court agreed with Justice Kennard, explaining that "if an unlawful killing in the course of an inherently dangerous assaultive felony without malice must be manslaughter ... and the offense is not voluntary manslaughter ..., the necessary implication of the majority's decision in *Bryant* is that the offense is involuntary manslaughter. Accordingly, an instruction on involuntary manslaughter as a lesser included offense must be given when a rational jury could entertain a reasonable doubt that an unlawful killing was accomplished with implied malice during the course of an inherently dangerous assaultive felony." (*Brothers, supra*, 236 Cal.App.4th at pp. 33–34.) However, as the *Brothers* court cautioned, "when, as here, the defendant indisputably has deliberately engaged in a type of aggravated assault the natural consequences of which are dangerous to human life, thus satisfying the objective component of implied malice as a matter of law, and no material issue is presented as to whether the defendant subjectively appreciated the danger to human life his or her conduct posed, there is no sua sponte duty to instruct on involuntary manslaughter .... Otherwise, an involuntary manslaughter instruction would be required in every implied malice case regardless of the evidence. We do not believe that this is what the Supreme Court intended in *Bryant*." (*Id*. at p. 35.)

Ruiz was entitled to an instruction on involuntary manslaughter pursuant to *Brothers* only if a rational jury could entertain a reasonable doubt that Prendiz's killing, although occurring during a beating with fists and kicks, was accomplished without malice. (*Brothers, supra*, 236 Cal.App.4th at pp. 33–34.) "Malice is implied when an unlawful killing results from a willful act, the natural and probable consequences of which are dangerous to human life, performed with conscious disregard for that danger." (*People v. Elmore* (2014) 59 Cal.4th 121, 133.)

The thrust of Ruiz's argument suggests there was evidence presented at trial from which the jury could have concluded he was guilty of involuntary manslaughter on the theory that the natural and probable consequences of his kick to Prendiz's head were not dangerous to Prendiz's life. [Fn.3] Ruiz draws attention to the facts that Prendiz did not lose consciousness at the scene and talked to paramedics, that Prendiz was able to walk two or three feet unassisted to the gurney, and that a healthy person likely would not have died from the same injuries. He argues these facts could have allowed the jury to entertain a reasonable doubt about the dangerousness of the kick, had the jury been instructed with involuntary manslaughter. However, these facts that Ruiz highlights need not—indeed, must not—be examined in a vacuum. Rather, these facts must be considered within the totality of the facts and surrounding circumstances. When all of the facts and circumstances are properly considered together, the record is devoid of evidence from which a reasonable jury could conclude Ruiz was guilty of involuntary manslaughter on the theory the kick was not dangerous to human life.

> [Fn.3] For purposes of analyzing this issue, we presume Ruiz kicked Prendiz only once.

Prendiz was 55 years old, had already been "wailed on" by James, and was on the ground in a vulnerable position. As Ruiz said, Prendiz had already taken "so many fuckin' hits." Ruiz was also wearing steel-toed boots, and kicked Prendiz in the head, a vulnerable part of the body housing the brain. The beating was so brutal it resulted in multiple facial fractures, massive bleeding, brain injuries, and a deformed head. Had Prendiz survived, facial reconstruction surgery would have been needed. The responding paramedic described Prendiz's injuries as "major," and an attending physician described them as "fairly serious."

Even though Prendiz was not rendered unconsciousness at the scene and a healthier person would likely have survived, the totality of the facts and circumstances nevertheless indisputably demonstrate the natural and probable consequences of the kick were dangerous to Prendiz's life. The evidence demonstrated Ruiz participated in a brutal, merciless beating, and that his kick, which was delivered after Prendiz had already sustained substantial injuries, was dangerous to Prendiz's life. Stated differently, while Prendiz's remaining conscious at the scene and his infirm health are factors that would tend to support Ruiz's argument that the kick was not dangerous to Prendiz's life, these facts pale when considered in light of the totality of the facts and circumstances that indisputably demonstrate the kick was dangerous to Prendiz's life. This was not a simple fist fight in which a single unlucky blow resulted in the victim's death. (*People v. Cook* (2006) 39 Cal.4th 566, 597.)

Additionally, Ruiz seems to suggest that the fact he was not the initial aggressor and that he at first tried to break up the fight demonstrate a lack of malice. However, regardless of what Ruiz initially did or did not do, he eventually decided to kick an injured and vulnerable victim in the head with steel-toed boots. There

1   was no evidence presented the kick was an accident or in self defense. Rather, the
2   evidence demonstrated the kick was intended to injure Prendiz.

3   In sum, the evidence at trial did not raise a material issue as to whether the killing
    was committed without malice, and therefore the trial court had no duty to instruct
4   on involuntary manslaughter as a lesser included offense. (*Brothers, supra*, 236
    Cal.App.4th at p. 35.)

5   Ruiz, 2020 WL 5423201, at *5-8.

6           a.      Failure to Present a Cognizable Federal Claim

7           The claim fails to present a federal question.  "[T]he failure of a state trial court to instruct

8   on lesser-included offenses in a non-capital case does not present a federal constitutional

9   question," Windham v. Merkle, 163 F.3d 1092, 1106 (9th Cir. 1998), because there is no clearly

10  established federal constitutional right to lesser-included offense instructions in non-capital cases.

11  United States v. Rivera-Alonzo, 584 F.3d 829, 834 n. 3 (9th Cir. 2009) (citing Solis v. Garcia,

12  219 F.3d 922, 929 (9th Cir. 2000)).  The Court cannot find a constitutional right to a lesser-

13  included offense instruction here because that would require the application of a new rule of law,

14  something the court cannot do under the holding in Teague v. Lane, 489 U.S. 288 (1989). See

15  Solis, 219 F.3d at 929 (habeas relief for failure to instruct on lesser included offense in non-

16  capital case barred by Teague because it would require the application of a new constitutional

17  rule); Turner v. Marshall, 63 F.3d 807, 819 (9th Cir.1995*), overruled on other grounds by* Tolbert

18  v. Page, 182 F.3d 677 (9th Cir.1999) (*en banc*) (same).

19          For the same reasons, Petitioner's claim cannot survive scrutiny under 28 U.S.C. §

20  2254(d).  Federal habeas relief is barred unless Petitioner can demonstrate that the state court's

21  alleged failure was contrary to, or an unreasonable application of, clearly established federal law

22  as determined by the Supreme Court.  Since there is no clearly established Supreme Court

23  authority requiring lesser-included offense instructions in a non-capital case, Petitioner's claim is

24  barred under § 2254(d).

25          b.      Harmless Error

26          As reasonably determined by the state court, even if the failure to *sua sponte* instruct on

27  involuntary manslaughter constituted error, it was harmless because the evidence did not warrant

28  such an instruction.  The state court noted that although the victim did not lose consciousness and

16

was able to talk to the paramedics and walk to the gurney, these were all factors to consider, but they must be considered within the totality of the facts.  In reviewing the totality of the facts, a reasonable jurist could find that the record was devoid of facts from which a jury could conclude that Petitioner's kick to the victim's head was not dangerous to human life.  As previously noted, Petitioner kicked the victim in the head with a steel-toed boot.  Petitioner himself admitted that he refrained from doing so in fights because a steel-toed boot is inherently dangerous.  The victim had already been beaten severely by James to the point that witnesses yelled at James to stop.  Despite this and although the victim was lying defenseless and bloody on the ground, Petitioner delivered a blow to the victim's head with his steel-toed boot.  Moreover, the jury specifically found that Petitioner acted with malice.  Thus, even if the jury had been instructed on involuntary manslaughter, there is no reasonable probability that the result would have been different.

c.      Ineffective Assistance of Counsel

In the alternative, Petitioner contends that counsel erred by failing to request the jury instruction on involuntary manslaughter.  Effective assistance of counsel is guaranteed by the Due Process Clause of the Fourteenth Amendment.  Evitts v. Lucey, 469 U.S. 387, 391-405 (1985).  Claims of ineffective assistance of counsel are reviewed according to Strickland's two-pronged test.  Strickland v. Washington, 466 U.S. 668, 687-88 (1984); Miller v. Keeney, 882 F.2d 1428, 1433 (9th Cir. 1989); United States v. Birtle, 792 F.2d 846, 847 (9th Cir.1986); see also Penson v. Ohio, 488 U.S. 75 (1988) (holding that where a defendant has been actually or constructively denied the assistance of counsel altogether, the Strickland standard does not apply and prejudice is presumed; the implication is that Strickland does apply where counsel is present but ineffective).

To prevail, Petitioner must show two things.  First, he must establish that counsel's deficient performance fell below an objective standard of reasonableness under prevailing professional norms.  Strickland, 466 U.S. at 687-88.  Second, Petitioner must establish that he suffered prejudice in that there was a reasonable probability that, but for counsel's unprofessional errors, he would have prevailed on appeal. Id. at 694. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome of the trial. Id. The relevant inquiry is not what

17

1  counsel could have done; rather, it is whether the choices made by counsel were reasonable.

2  Babbitt v. Calderon, 151 F.3d 1170, 1173 (9th Cir. 1998).

3       With the passage of the AEDPA, habeas relief may only be granted if the state-court

4  decision unreasonably applied this general Strickland standard for ineffective assistance.

5  Knowles v. Mirzayance, 556 U.S. 111, 122 (2009).  Accordingly, the question "is not whether a

6  federal court believes the state court's determination under the Strickland standard "was incorrect

7  but whether that determination was unreasonable–a substantially higher threshold."  Schriro v.

8  Landrigan, 550 U.S. 465, 473 (2007); Knowles, 556 U.S. at 123.  In effect, the AEDPA standard

9  is "doubly deferential" because it requires that it be shown not only that the state court

10  determination was erroneous, but also that it was objectively unreasonable.  Yarborough v.

11  Gentry, 540 U.S. 1, 5 (2003).  Moreover, because the Strickland standard is a general standard, a

12  state court has even more latitude to reasonably determine that a defendant has not satisfied that

13  standard.  See Yarborough v. Alvarado, 541 U.S. 652, 664 (2004) ("[E]valuating whether a rule

14  application was unreasonable requires considering the rule's specificity.  The more general the

15  rule, the more leeway courts have in reaching outcomes in case-by-case determinations.")

16       Here, the state court was not unreasonable in finding that defense counsel did not err in

17  failing to request the instruction on involuntary manslaughter.  As previously noted, the record

18  was devoid of facts to support the instruction.  Petitioner also fails to demonstrate any prejudice.

19  Since the record did not support the instruction, a request by defense counsel would have been

20  denied.  Furthermore, the jury determined that Petitioner acted with malice.  Thus, had the trial

21  court given the instruction, the outcome would not have been different.

22       Petitioner contends his trial attorney was charged with twelve counts of misconduct

23  regarding his representation of three other clients.  He states that counsel was found to have

24  committed eleven ethical violations.  However, Petitioner must show that counsel erred in *his*

25  trial–which he has not done.  Counsel's errors in other trials are irrelevant to the determination

26  whether counsel erred in *this* trial.  In addition, as noted by Respondent, Petitioner failed to

27  present these allegations and facts to the state courts.  He is, therefore, barred from raising them

28  here.  Pinholster, 563 U.S. at 181-82 ("review under § 2254(d)(1) is limited to the record that was

18

1    before the state court that adjudicated the claim on the merits.").

2        3.        Admission of Prior Bad Act

3        In his third and final claim, Petitioner alleges the trial court prejudicially erred by

4    admitting evidence of an uncharged prior assault.  Petitioner raised this claim on direct review.

5    The Fifth DCA denied the claim as follows:

> Finally, Ruiz contends the trial court prejudicially abused its discretion in allowing the jury to hear the evidence of the incident involving D. The court admitted the evidence for the limited purpose of proving Ruiz's knowledge of the risk to human life that would follow from kicking someone in the head with steel-toed boots. We conclude the trial court improperly allowed the evidence of this incident, but conclude Ruiz did not suffer prejudice.
>
> Evidence of prior convictions or uncharged crimes is inadmissible to establish propensity to commit a crime on a particular occasion. (Evid. Code, § 1101, subd. (a).) Subdivision (a) of Evidence Code section 1101 provides that subject to certain exceptions "evidence of a person's character or a trait of his or her character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his or her conduct) is inadmissible when offered to prove his or her conduct on a specified occasion." Evidence of prior convictions or uncharged crimes is admissible, however, to prove "that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, ...) ...." (Evid. Code, § 1101, subd. (b).)
>
> "'The admissibility of other crimes evidence depends on (1) the materiality of the facts sought to be proved, (2) the tendency of the uncharged crimes to prove those facts, and (3) the existence of any rule or policy requiring exclusion of evidence.'" (*People v. Lindberg* (2008) 45 Cal.4th 1, 22.) "The trial court has great discretion in determining the admissibility of evidence ...." (*People v. Williams* (2009) 170 Cal.App.4th 587, 606; accord, *People v. Valdez* (2012) 55 Cal.4th 82, 170.) A trial court's decision to admit evidence of uncharged offenses under Evidence Code sections 1101, subdivision (b), and 352 is reviewed for an abuse of discretion. (*People v. Foster* (2010) 50 Cal.4th 1301, 1328 (*Foster*).) Reversal is warranted only if ""'the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.'"" (*Id.* at pp. 1328–1329; see also *People v. Memory* (2010) 182 Cal.App.4th 835, 862 ["'erroneous admission ... of evidence does not require reversal except where the error ... caused a miscarriage of justice'"].) "[A] 'miscarriage of justice' should be declared only when the court, 'after an examination of the entire cause, including the evidence,' is of the 'opinion' that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." (*People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*); see *People v. Rains* (1999) 75 Cal.App.4th 1165, 1170.)
>
> Here, Ruiz's knowledge of the dangerousness to human life of a kick to the face with steel-toed boots was certainly material. He was charged with murder on an implied malice theory, which requires a showing Ruiz had knowledge of the dangerous of his conduct to human life.
>
> However, the D. incident did not have a tendency to prove Ruiz's knowledge of the

19

dangerousness to human life of kicking someone in the head with steel-toed boots because James stopped Ruiz from kicking D.'s head. Since the kick was thwarted, Ruiz was not able to observe the damage his kick would have caused to D. The People argue James's act of stopping Ruiz from stomping on D. conveyed to Ruiz that kicking a person with steel-toed boots would be dangerous to human life. We reject the People's argument. It is an unreasonable leap to say that James prevented the stomp because he knew the stomp would have endangered D.'s life, and that this knowledge was silently imparted to Ruiz. There was no evidence presented James or anyone else told Ruiz that stomping or kicking a person in the head with steel-toed boots would have endangered someone's life. Thus, it was improper to allow evidence of this incident as probative of Ruiz's knowledge of the danger to human life from a kick to the head.

Notwithstanding, there was no prejudicial abuse of discretion because no miscarriage of justice resulted. (*Foster, supra*, 50 Cal.4th at pp. 1328-1329.) This is because there is no reasonable probability Ruiz would have obtained a more favorable result absent the admission of the D. incident. (*Watson, supra*, 46 Cal.2d at p. 836.) Ruiz plainly admitted in his post-arrest interview he knew steel-toed boots were a "weapon" capable of causing "serious damage," which he explained is why he did not kick people during fights. While Ruiz did not specifically admit to knowing that kicking someone's head with steel-toed boots endangers human life, such knowledge could nevertheless be inferred from Ruiz's acknowledging boots can cause "serious damage." Furthermore, his knowledge of the dangerousness to human life could be easily gleaned from his statement he does not kick people in fights because of the dangerousness. In sum, Ruiz's knowledge of the risk to human life from kicking someone's head with steel-toed boots could have been easily gleaned from Ruiz's own statements—reference to the D. incident was unnecessary for that purpose.

Additionally, Ruiz contends evidence of the D. incident was nothing more than improper evidence of his violent character. However, Ruiz admitted to detectives he had been fighting "[his] whole life." The details of the D. incident were also not particularly violent or disturbing, especially when compared to the evidence of the homicide.

Furthermore, the jury was admonished that the evidence of the incident "may not be considered ... to prove that [Ruiz] is a person of bad character or that he had a disposition to commit crimes." Thus, while the trial court erred in admitting the evidence of this prior incident, no miscarriage of justice resulted and no reversal is required.

Ruiz, 2020 WL 5423201, at *8-9.

### a.      Legal Standard and Analysis

This claim is not cognizable on federal habeas review because the admissibility of evidence is a matter of state law.  Estelle, 502 U.S. at 67-68 (state evidentiary ruling cannot provide ground for federal habeas relief unless the admission of evidence violated due process). Additionally, Petitioner cannot show that the trial court's admission of other bad acts evidence was contrary to or an unreasonable application of Supreme Court precedent pursuant to 28 U.S.C.

§ 2254(d), since there is no Supreme Court precedent governing a court's discretionary decision to admit evidence as a violation of due process.  In Holley v. Yarborough, the Ninth Circuit stated:

> Under AEDPA, even clearly erroneous admissions of evidence that render a trial fundamentally unfair may not permit the grant of federal habeas corpus relief if not forbidden by "clearly established Federal law," as laid out by the Supreme Court. 28 U.S.C. § 2254(d). In cases where the Supreme Court has not adequately addressed a claim, this court cannot use its own precedent to find a state court ruling unreasonable. Musladin, 549 U.S. at 77, 127 S.Ct. 649.
>
> The Supreme Court has made very few rulings regarding the admission of evidence as a violation of due process. Although the Court has been clear that a writ should be issued when constitutional errors have rendered the trial fundamentally unfair, see Williams, 529 U.S. at 375, 120 S.Ct. 1495, it has not yet made a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ. Absent such "clearly established Federal law," we cannot conclude that the state court's ruling was an "unreasonable application." Musladin, 549 U.S. at 77, 127 S.Ct. 649. Under the strict standards of AEDPA, we are therefore without power to issue the writ . . . .

Holley v. Yarborough, 568 F.3d 1091, 1101 (9th Cir. 2009); see 555 F.3d 742, 760 (9th Cir. 2008) (holding that trial court did not abuse its discretion in excluding expert testimony "[b]ecause the Supreme Court's precedents do not establish a principle for evaluating discretionary decisions to exclude the kind of evidence at issue here").  Since there is no clearly established Supreme Court precedent governing a trial court's discretionary decision to admit evidence as a violation of due process, habeas relief is foreclosed.  Id.

Even if the Court were to consider the claim, Petitioner would not be entitled to relief. The admission of the evidence was harmless given the overwhelming evidence in the record from which a rational jury could conclude that Petitioner knew his act of kicking the vulnerable victim with a steel-toed boot was dangerous to human life.  Petitioner admitted in his post-arrest interview that he considered a steel-toed boot to be a weapon that could cause serious damage. The jury could also infer that he knew his act was dangerous to human life from his statement that he refrained from kicking individuals with steel-toed boots because it was dangerous.  Thus, the additional evidence of the other act was cumulative and unnecessary.

Petitioner further contends that the evidence was prejudicial because the jury could have found him guilty because the evidence of the other bad act could lead to the conclusion that he

had a violent character.  As noted by the state court, however, this evidence was inconsequential compared to the gruesome facts of the underlying crime and Petitioner's own testimony that he had been fighting his whole life.

In conclusion, Petitioner fails to state a viable constitutional claim, and even if the Court were to consider it, Petitioner has not demonstrated that the state court rejection was contrary to or an unreasonable application of Supreme Court precedent.  The claim should be rejected.

**IV.     RECOMMENDATION**

Based on the foregoing, the Court RECOMMENDS that the Petition for Writ of Habeas Corpus be DENIED with prejudice on the merits.

This Findings and Recommendation is submitted to the United States District Court Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636 (b)(1)(B) and Rule 304 of the Local Rules of Practice for the United States District Court, Eastern District of California.  Within thirty (30) days after being served with a copy of this Findings and Recommendation, any party may file written objections with the Court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendation."  Replies to the Objections shall be served and filed within fourteen (14) court days (plus three days if served by mail) after service of the Objections.  The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636 (b)(1)(C).  The parties are advised that failure to file objections within the specified time may waive the right to appeal the Order of the District Court. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

Dated:   **January 26, 2022**                        _/s/ Sheila K. Oberto_
                                                   UNITED STATES MAGISTRATE JUDGE

22